Argued and submitted April 14, 2003, reversed and remanded April 21, both petitions for review denied September 28, 2004 (337 Or 476)

WATERWATCH OF OREGON, INC.,
an Oregon nonprofit corporation,
*Petitioner,*

*v.*

WATER RESOURCES COMMISSION,
a state agency;
Water Resources Department,
a state agency;
and Coos Bay North Bend Water Board,
an Oregon municipal corporation,
*Respondents,*

*and*

CITY OF LAKESIDE,
an Oregon municipal corporation;
Tenmile Lakefront Owners Association;
and Department of Fish and Wildlife,
a state agency,
*Other parties.*

CC 13; A113693

88 P3d 327

Brian J. Posewitz argued the cause and filed the briefs for petitioner. With him on the brief was Tonkon Torp LLP.

Philip Schradle, Special Counsel to the Attorney General, argued the cause for respondents Water Resources Commission and Water Resources Department. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

James C. Coffey argued the cause for respondent Coos Bay North Bend Water Board. With him on the brief was Stebbins & Coffey.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

DEITS, C. J.

### DEITS, C. J.

Petitioner, WaterWatch of Oregon, Inc., seeks review of a final order of the Oregon Water Resources Commission (commission), approving a water appropriation permit.[1] WaterWatch challenged the permit application on several grounds, including that the applicant, the Coos Bay North Bend Water Board (CBNB), could not make beneficial use of the water within the five-year limit provided in ORS 537.230(1) (1997).[2] Ultimately, the commission rejected WaterWatch's challenges and approved the permit with conditions. On review, we reverse and remand.

In March 1990, CBNB applied to the Water Resources Department (department) for a permit to appropriate water from Tenmile Creek in Coos County. CBNB also prepared four alternative water demand forecasts, each projecting different growth and water needs through as late as 2050. Apparently, CBNB sought to appropriate water for a potential industrial user and for an existing industrial user that projected a greater need; however, the potential user ultimately decided not to locate its facility in Coos County and the existing user reduced its projected need.

In December 1997, the department issued a proposed final order, approving the requested appropriation permit with conditions. WaterWatch and others, including the City of Lakeside, filed protests, and the department held a contested case proceeding. Thereafter, the commission considered the matter and approved the permit. The commission found CBNB's third water demand forecast, which used a base demand derived from past experience plus a projected

---

[1] Petitioner on review is WaterWatch of Oregon, Inc., and respondents on review are the Oregon Water Resources Commission, the Oregon Water Resources Department, and the Coos Bay North Bend Water Board. The City of Lakeside was a protestant below, and the Tenmile Lakefront Owners Association and the Oregon Department of Fish and Wildlife were intervenors below. The City of Lakeside, the Tenmile Lakefront Owners Association, and the Oregon Department of Fish and Wildlife are not parties to this judicial review proceeding.

[2] ORS 537.230 (1997) was amended in 1999. Or Laws 1999, ch 453, § 1. That amendment applies to any application for a permit filed after October 23, 1999. Or Laws 1999, ch 453, § 3. Because the application was filed before that date, the 1999 amendments do not apply. In this opinion, references to ORS 537.230 are to the 1997 version.

additional industrial demand, to be "reasonable." Water-Watch asserted that that forecast showed that CBNB would not need water beyond its present resources and planned capacity until approximately 2050. The commission, however, accepted the contrary position that, by 2050, the need will be 3 million gallons of water per day. A diversion of 4.6 cubic feet per second would supply that need, but the commission allowed an additional 18.6 cubic feet per second in order to accommodate a potential industrial user who might require as much as 12 million gallons of water per day. The commission issued its final order granting the permit and allowing CBNB to withdraw water at a maximum rate of 23.2 cubic feet per second. WaterWatch seeks our review of that order.

■       Before turning to the merits, we must address the jurisdictional issue of whether WaterWatch has standing to seek judicial review of the commission's order. We first determine whether WaterWatch has standing under the pertinent statutes. *See Utsey v. Coos County*, 176 Or App 524, 548-49, 32 P3d 933 (2001), *rev dismissed*, 335 Or 217 (2003). In making that determination, under the holding in *Local No. 290 v. Dept. of Environ. Quality*, 323 Or 559, 566, 919 P2d 1168 (1996), a case concerning only statutory standing, we are directed to the requirements of the specific statute that confers standing in a particular type of proceeding. We then must determine whether the constitutional requirements for standing have been satisfied. *Utsey*, 176 Or App at 548-49. In response to our inquiry, WaterWatch asserts that it has statutory and constitutional standing to seek review of the commission's order.

WaterWatch first argues, relying on ORS 183.480 and ORS 183.482, which are general review provisions of Oregon's Administrative Procedures Act (APA), that its party status before the commission gives it statutory standing to seek review of the commission's order in this court. Specifically, WaterWatch relies on ORS 183.480(1), which provides, in pertinent part, that "any person adversely affected or aggrieved by an order *or any party to an agency proceeding* is entitled to judicial review of a final order, whether such order is affirmative or negative in form." (Emphasis added.)

The problem with WaterWatch's reliance on those general APA provisions, however, is that Oregon's water law statutes include specific provisions governing judicial review in these circumstances. Those water law statutes contain different standing requirements from the general APA provision cited above. To the extent that the more general provisions of the APA and the specific water law statutes concerning judicial review are different, the water law statutes control. ORS 174.020(2).

The water law statute concerning judicial review is ORS 536.075(2), which provides that "[a]ny party affected by a final order in a contested case issued by the Water Resources Commission or the Water Resources Department may appeal the order to the Court of Appeals." The plain language of ORS 536.075(2) indicates that affected parties may seek review of a final order. Under the water law statutes, a party to a contested case before the department includes "any person who timely filed a protest." ORS 537.170(2)(b).[3] "Any person may submit a protest against a proposed final order." ORS 537.153(6). An association such as WaterWatch is a person. ORS 174.100(5).[4] Further, after a contested case hearing and the issuance of a final order under ORS 537.170, "any party may file exceptions to the order" with the commission.

---

[3] ORS 537.170(2) provides, in part:

"Notwithstanding the provisions of ORS 183.310 to 183.550 pertaining to contested case proceedings, the parties to any contested case hearing initiated under this section shall be limited to:

"(a) The applicant;

"(b) Any person who timely filed a protest; and

"(c) Any person who timely filed a request for standing under ORS 537.153(5) and who requests to intervene in the contested case hearing prior to the start of the proceeding."

With regard to a person requesting standing, we note that ORS 537.153(5) provides:

"Any person who supports a proposed final order may request standing for purposes of participating in any contested case proceeding on the proposed final order or for judicial review of a final order. A request for standing shall be in writing and shall be accompanied by the fee established under ORS 536.050(1)(n)."

[4] ORS 174.100(5) provides a general statutory definition for the word "person" unless the context requires that another definition applies or another specific definition applies.

ORS 537.173. Here, the parties do not dispute that Water-Watch filed a timely protest against the proposed order and filed exceptions. Accordingly, WaterWatch was a party.

As noted above, the plain language of ORS 536.075(2) also provides that, in order to seek review of a final order, a party must be "affected" by the order. Notably, that statute does not require the party to be "adversely affected" or "aggrieved," common terms used to describe standing to seek review of administrative actions. Because the text of ORS 536.075(2) does not define the term "affected," we look to the context of ORS 536.075 to determine the legislature's intent. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993).

The above statutes as well as a number of related statutes are indicative of the nature of the interests that the legislature intended a party to have to be considered "affected" by an order of the commission. The approval process involves a public interest determination. *See, e.g.*, ORS 537.153 (describing the rebuttable presumption that a proposed use will not impair or be detrimental to the public interest); ORS 537.170 (providing that, if the presumption is rebutted, the director or commission shall determine whether the proposed use would impair or be detrimental to the public interest by considering the described factors). As discussed above, to assist in making that determination, the legislature has allowed any person to submit a protest to a proposed order and become a party to the contested case. ORS 537.153(6) requires, in part, that a protest must include, among other things:

> "(b)   A description of the protestant's interest in the proposed final order and, if the protestant claims to represent the public interest, a precise statement of the public interest represented;

> "(c)   A detailed description of how the action proposed in the proposed final order would impair or be detrimental to the protestant's interest[.]"

The above statutes demonstrate that the legislature intended three groups of persons to become parties to a contested case proceeding concerning a water permit: (1) the applicant; (2) a person who requests standing, which under

the statutes means a person who supports the proposed final order; and (3) a person who protests the proposed final order. Those statutes also demonstrate that a protestant's interests may include the public interest. Accordingly, by specifically defining who is a party to a contested case proceeding concerning a water permit, the legislature has identified three groups of persons who are *affected* by the proposed final order in either positive or negative ways. Even after the contested case proceeding, any *party* may file exceptions with the commission. Consequently, it is apparent that the legislature contemplated that a party to a contested case proceeding may be affected by the commission's order. ORS 536.075(2) ("Any party affected by a final order in a contested case issued by the [commission] * * * may appeal the order to the Court of Appeals.").

In this case, WaterWatch indicated in its protest that it was representing "the general public interest in the water resources of this state" as well as the interests of its members and itself. WaterWatch also described the specific interests that it represented and explained how the proposed final order would impair or be detrimental to those interests. Additionally, in its petition for judicial review, WaterWatch indicated that it would be adversely affected by the commission's order. *See* ORS 536.075(4).[5] Specifically, in its response to our inquiry regarding its standing, WaterWatch indicated that it is adversely affected by the commission's order in the following way:

> "WaterWatch has a particular interest in the instream flows of Tenmile Creek. WaterWatch has invested time, effort and money in creating instream water rights, including the instream water rights in Tenmile Creek.[6]

---

[5] Although, as noted above, ORS 536.075(2) requires only that a party be "affected" by a final order of the commission, ORS 536.075(4), which describes the requirements of a petition for judicial review, provides that "[t]he petition shall state the facts showing how the petitioner is *adversely affected* by the order and the ground or grounds upon which the petitioner contends the order should be reversed or remanded." (Emphasis added.) Even if ORS 536.075(4) were to alter the standing requirement in ORS 536.075(2), for the reasons that we will discuss, we believe that WaterWatch has demonstrated that it was "adversely affected" by the commission's order.

[6] Instream water rights are described in OAR 690-077-0000, which provides, in part:

WaterWatch was instrumental in obtaining passage of legislation that allowed for instream water rights, spending its money in the process. WaterWatch also spent money advocating for instream water rights in Tenmile Creek. The instream water rights in Tenmile Creek therefore represent the fruits of a WaterWatch investment (of money as well as time and effort). A permit giving the Board a priority over those rights will diminish the return on * * * WaterWatch's investment, including the return on WaterWatch's investment of its funds."[7]

---

"(3) In 1987, the Legislature created a new type of water right called an instream water right. Instream water rights are established by certificate from the Water Resources Commission or by lease agreement, pursuant to ORS 537.332 to 537.360, to maintain and support public uses within natural streams and lakes. These public uses include, but are not limited to recreation, scenic attraction, aquatic and fish life, wildlife habitat and ecological values, pollution abatement and navigation. Instream water rights may also be established as a result of the allocation of conserved water under ORS 537.455 to 537.500 and 540.510 (OAR chapter 690, division 18).

"* * * * *

"(5) Instream water rights differ from other water rights because control or diversion of the water is not required. Instream water rights are held in trust by the Water Resources Department but are regulated and enforced like all other water rights.

"(6) Instream water rights do not take away or impair any legally established right to the use of water having an earlier priority date than the instream right."

[7] In her affidavit, Nancy Duhnkrack, president of WaterWatch's board of directors, averred, in part:

"8. In 1987, WaterWatch was instrumental in the drafting and passage of the Oregon Instream Water Rights Act. This law allowed for the establishment of instream water rights to protect streamflows needed for fish, wildlife, water quality, recreational and aesthetic values of river segments throughout Oregon. Since passage of the Act, WaterWatch has been involved in proceedings to support the establishment of new instream water rights statewide, including instream water rights for Tenmile Creek. In other words, WaterWatch has invested significant time, effort and money in establishing instream water rights, including instream water rights for Tenmile Creek.

"9. If the water appropriation permit at issue in this case is issued, the permit will harm WaterWatch because it will significantly diminish the return on WaterWatch's investment in creating the instream water rights for Tenmile Creek (including WaterWatch's investment in creating statutes that allow for instream water rights). The permit will do that because it will be issued with an earlier priority date than the instream water rights for Tenmile Creek (even though the instream water rights are being put to beneficial use now while the applicant in this case does not plan to make beneficial use of the permitted appropriation for at least 25 years). The permit at issue in this case will have an earlier priority date because the application for the permit was made a few months before the applications for the instream water rights were made. As a result, the instream water rights will be subject to (and not protected against)

(Citations to affidavits omitted.)

Because WaterWatch had spent time, money, and effort to create an instream water right in Tenmile Creek, and because any instream right would be subject to CBNB's use of water in light of the fact that CBNB's permit would have an earlier priority date than any instream right, WaterWatch's investment in the creation of an instream right in Tenmile Creek would be diminished. For all of the above reasons, WaterWatch has demonstrated that it has standing pursuant to ORS 536.075(2) to seek review of the commission's order.

■■ That conclusion, however, does not end our inquiry. In *Utsey*, we explained that, "regardless of what the legislature provides regarding the standing of litigants to obtain judicial relief, the courts *always* must determine that the constitutional requirements of justiciability are satisfied." 176 Or App at 548 (emphasis in original). In particular, we reasoned that (1) the party that invokes the jurisdiction of the court has the "obligation to establish the justiciability of its claim"; (2) to establish that the claim is justiciable, the party "must demonstrate that a decision in this case will have a practical effect on its rights"; and (3) "[t]he case law concerning the 'practical effects' requirement clearly states that an abstract interest in the proper application of the law is not sufficient." *Id.* at 549-50. Under that standard, WaterWatch must demonstrate that the commission's decision will have a practical effect on its rights.

In *Utsey*, the organization that sought standing, the League of Women Voters of Coos County,

> "submitted a letter to the county in opposition to the Lillies' application. The letter did not identify what the League is, nor did it provide any explanation of the League's interest in the application. It simply stated that the League opposed the application on the ground that approval would be unlawful. When the Lillies appealed to LUBA, the League

---

possible later use of the water by the applicant in this case. Because of that contingency, the instream water rights that WaterWatch has invested time, effort and money to help create will have a lower value than they would if they were not subject to later appropriation by the applicant in this case. Water-Watch's investment will therefore be injured by the requested appropriation permit."

moved to intervene. Once again, the League did not explain what it is or the nature of its interest in the application or how it would be affected by a decision on it one way or the other. The motion merely stated the fact of the League's appearance before the county. On appeal, the League provides no additional information concerning its composition, its interest in the application, or any practical effect that a decision would have on its rights. It simply cites ORS 197.850(1) and ORS 197.830(2) and (7) and contends that the legislature's conferral of statutory standing on any person without regard to any practical interest in the outcome suffices to create a justiciable controversy."

176 Or App at 548-49. Unlike the League of Women Voters in *Utsey*, WaterWatch has identified specific effects on it as an organization as well as specific effects on individual members of WaterWatch.

As noted above, the president of WaterWatch's board of directors averred that WaterWatch was instrumental in the drafting and passage of the Oregon Instream Water Rights Act in 1987 and that it has invested significant time, effort, and money in establishing instream water rights throughout the state. Significantly, and more importantly in this case, WaterWatch has spent time, effort, and money in advocating for the creation of an instream water right in Tenmile Creek. As discussed above, WaterWatch asserts that the commission's order approving the permit in this case will harm WaterWatch by significantly diminishing its investment in the creation of an instream water right in Tenmile Creek. Specifically, WaterWatch explains that the permit that the commission approved in this case will have an earlier priority date than any instream right; thus, the instream right would be subject to CBNB's use of water.

For those reasons, WaterWatch has identified plausible, actual, concrete ramifications from the commission's approval of CBNB's permit. Of particular significance, WaterWatch has been involved in proceedings to support the establishment of an instream water right for Tenmile Creek, the specific waterway at issue in the permit approved in the commission's order. Those interests asserted by WaterWatch are not simply academic or abstract political or policy beliefs. We conclude that WaterWatch established, for purposes of

constitutional justiciability requirements, that the issuance of the permit has sufficient practical effects on it as an organization.

In addition to demonstrating that the issuance of the permit will have a sufficient practical effect on WaterWatch as an organization to satisfy the constitutional justiciability requirements, WaterWatch has also demonstrated that the commission's approval of the permit would have practical effects on specific individual members of WaterWatch. We may consider the practical effects on specific individual members of an organization in our constitutional justiciability analysis. *See Friends of Jacksonville v. City of Jacksonville*, 189 Or App 283, 285 n 1, 76 P3d 121 (2003), *rev den*, 336 Or 422 (2004) (reasoning that a neighborhood association had standing to appear on behalf of its members where several members submitted affidavits indicating that they would be adversely affected by the land use decision).

In response to this court's inquiry, WaterWatch submitted the affidavits of two of its members alleging that they each have used Tenmile Creek for recreation and that the permit granted to CBNB threatens their continued use and enjoyment.[8] Those members assert that their use and enjoyment of the waterway will be detrimentally affected by the

---

[8] In his affidavit, Karl Anuta, a member and board member of WaterWatch, averred, in part:

"4. I have personally used and enjoyed the benefits of instream flows in Tenmile Creek. I have paddled Tenmile Creek, with my wife and my youngest daughter. I plan to return to Tenmile Creek in the future and hope to enjoy those benefits again.

"5. An appropriation permit that allows water to be diverted from Tenmile Creek would adversely affect my use and enjoyment of the instream flows of Tenmile Creek, by reducing flows that support fish, wildlife and recreation."

In his affidavit, Jim Thurber, a member of WaterWatch, averred, in part:

"2. I reside in Lakeside, Oregon. My house is approximately one mile from Tenmile Creek.

"* * * * *

"4. I regularly use and enjoy the benefits of instream flows in Tenmile Creek. I fish and boat in Tenmile Creek. I enjoy the scenery provided by the instream flows of Tenmile Creek. I enjoy observing wildlife that exists because of instream flows in Tenmile Creek. I also enjoy simply knowing the instream flows exist and knowing that the fish and wildlife they support exist.

"5. I am familiar with the appropriation permit sought by the Coos Bay North Bend Water Board (the 'Board'). The appropriation permit would adversely affect my use and enjoyment of Tenmile Creek. The permit would do

issuance of the permit because the commission's approval of the permit allowing water to be diverted from Tenmile Creek would reduce the instream flow. The effect on individual members is yet another reason to conclude that WaterWatch has standing.[9] Accordingly, for the reasons stated above, WaterWatch has constitutional standing to seek review of the commission's order in this court.[10]

■       We now turn to the merits of this judicial review. As noted above, in December 1997, the department evaluated CBNB's application for a water appropriation permit and concluded that the rebuttable presumption that the proposed use will not impair or be detrimental to the public interest had been established and that the presumption had not been overcome. *See* ORS 537.153(2).[11] Accordingly, the department issued a proposed final order approving the permit with conditions. WaterWatch and the City of Lakeside then filed

that by allowing the Board to diminish instream flows in Tenmile Creek and thereby diminish my enjoyment of the benefits of instream flows."

[9] Even though we consider the effect on individual members in our constitutional analysis and note that that is another reason to conclude that WaterWatch has standing, we do not consider the effect on individual members in determining whether WaterWatch has demonstrated that it has statutory standing. *See Local No. 290*, 323 Or 559.

[10] In view of our conclusion that WaterWatch has standing under the standard articulated in *Utsey*, it is not necessary for us to address the arguments that *Utsey* was wrongly decided.

[11] ORS 537.153(2) provides:

"In reviewing the application under subsection (1) of this section, the department shall presume that a proposed use will not impair or be detrimental to the public interest if the proposed use is allowed in the applicable basin program established pursuant to ORS 536.300 and 536.340 or given a preference under ORS 536.310(12), if water is available, if the proposed use will not injure other water rights and if the proposed use complies with rules of the Water Resources Commission. This shall be a rebuttable presumption and may be overcome by a preponderance of evidence that either:

"(a) One or more of the criteria for establishing the presumption are not satisfied; or

"(b) The proposed use will impair or be detrimental to the public interest as demonstrated in comments, in a protest under subsection (6) of this section or in a finding of the department that shows:

"(A) The specific public interest under ORS 537.170(8) that would be impaired or detrimentally affected; and

"(B) Specifically how the identified public interest would be impaired or detrimentally affected."

protests, and a contested case proceeding was held. Thereafter, the commission evaluated whether the criteria in ORS 537.153(2) had been satisfied. The commission summarized the issue presented to it in its order:

"To defeat the PFO[, the proposed final order], the record must show that one or more of the criteria in ORS 537.153(2), set out at OAR 690-310-0110(1), was not satisfied or that the proposed use would impair or be detrimental to the public interest in consideration of the specific elements of public interest identified in ORS 537.170(8)."[12]

The commission concluded that the criteria for establishing the presumption under ORS 537.153(2) had been satisfied and that the protestants had failed to rebut that presumption. It held that the proposed use, as conditioned, would not impair or be detrimental to the public interest and that the permit should be issued. WaterWatch now seeks review of the commission's final order.

As pertinent to our review, the commission, in its order, applied ORS 537.230, which provides, in part:

---

[12] ORS 537.170(8) provides:

"If the presumption of public interest under ORS 537.153(2) is overcome, then before issuing a final order, the director or the commission, if applicable, shall make the final determination of whether the proposed use or the proposed use as modified in the proposed final order would impair or be detrimental to the public interest by considering:

"(a) Conserving the highest use of the water for all purposes, including irrigation, domestic use, municipal water supply, power development, public recreation, protection of commercial and game fishing and wildlife, fire protection, mining, industrial purposes, navigation, scenic attraction or any other beneficial use to which the water may be applied for which it may have a special value to the public.

"(b) The maximum economic development of the waters involved.

"(c) The control of the waters of this state for all beneficial purposes, including drainage, sanitation and flood control.

"(d) The amount of waters available for appropriation for beneficial use.

"(e) The prevention of wasteful, uneconomic, impracticable or unreasonable use of the waters involved.

"(f) All vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights.

"(g) The state water resources policy formulated under ORS 536.295 to 536.350 and 537.505 to 537.534."

"(1) Except as provided in ORS 537.240 [addressing appropriation subject to permits from the Federal Energy Regulatory Commission] or 537.248 [providing a 10-year limit on initiation of construction of diversion or storage works for municipalities under a reservoir permit] or under an application by a municipal corporation for municipal uses or purposes, actual construction work shall begin within one year from the date of approval of the application. The construction of any proposed irrigation or other work shall be prosecuted with reasonable diligence and be completed within a reasonable time, as fixed in the permit by the Water Resources Department, not to exceed five years from the date of approval.

"(2) Except as provided in ORS 537.240 or 537.248, the department, for good cause shown, shall order and allow an extension of time, including an extension beyond the five-year limit established in subsection (1) of this section within which irrigation or other works shall be completed or the right perfected. In determining the extension, the department shall give due weight to the considerations described under ORS 539.010(5) and to whether other governmental requirements relating to the project have significantly delayed completion of construction or perfection of the right."

The commission determined that ORS 537.230(1) applies to municipalities and that it plays a role in its decision to issue a permit. The commission concluded, however, that the five-year construction completion time period in subsection (1) did not bar the issuance of the permit. According to the commission, the key issue was whether CBNB was going to pursue development of the project with "reasonable diligence." The commission explained:

"We agree with [the department's] reading of the relevant statutes and rules and conclude that the five year time period set out in ORS 537.230 may be extended as necessary, given due diligence in pursuit of the application of water under the permit. Even if the record shows that the municipality cannot complete its project within five years, that is not a bar to granting a permit. In this case, the appropriate question is whether the record shows that on receipt of a permit the applicant will initiate and pursue development of the project with reasonable diligence for a

municipal water user. That is a question of fact to be decided on the record. * * *

"* * * * *

"At its August 3, 2000, meeting, CBNB passed a resolution that it will use due diligence in developing the permit at issue in this application. CBNB will begin by establishing a ga[u]ging station near where an intake structure might be located. The station will fine tune data and allow a better design of the intake facility. It will also provide information on alternatives for use of the water by showing how much treatment the water requires. Siting the ga[u]ge will require a period of calibration to make sure the ga[u]ge is functioning properly. CBNB will also engage in water quality sampling during the time the gauging station is operating.

"It will take one to two years to have the gauging station functioning properly and giving meaningful data. If a permit in this case issued on December 31, 2000, CBNB will begin activities under the permit in November of 2001. It is currently engaged in a water expansion project.

"It may take up to three years to tie the hydrology of Tenmile Creek to the water quality data CBNB will collect. The combination of those two data sets will tell CBNB whether it can use Tenmile Creek water in its raw state or whether it will have to construct a treatment facility. As hydrology data become more refined, CBNB will also have better information about where to site the waterworks for Tenmile Creek.

"Once CBNB has gathered sufficient data from the gauging station, it will apply to state and federal agencies for feedback on the various alternative uses for the water it has crafted. The next set of activities CBNB engages in will involve dealing with National Environmental Protection Act (NEPA) and legislative issues. Land acquisition issues may also arise as the project is proposed. Alternatives to Tenmile Creek may also require study as more data are developed.

"It could take five to ten years to conclude the NEPA process as a prelude to development of the water right. Fisheries issues will be part of the negotiations; wetlands issues may also arise. There will likely be discussions with

the United States Forest Service (USFS) regarding Wild and Scenic River designation for Tenmile Creek.

"The next step for CBNB under the permit would be the design process. That depends on what alternative is permitted. It will take approximately two years from design to construction. If the project involves a pipeline, the process could be longer because of restrictions on construction during certain periods.

"As CBNB moves through each step of the process involving use of Tenmile Creek water, it will evaluate the demand for that water.

"*In summary, in the next five years CBNB will budget money for the gauging station, get it calibrated, and gather two to three years' worth of data. There may be time within the five year period to begin the NEPA prescoping process, designed to find flaws in the proposed alternative and to develop state and federal agency issues. The prescoping process takes about a year, depending on the response from the agencies. Additional studies might be necessary at that point.*

"Formal NEPA scoping can take five years before a final Environmental Impact Statement issues. From start to finish, the whole process to FEIS involves 10 to 11 years. Design will take a maximum of two years, and construction can take two to three years.

"\* \* \* \* \*

"\* \* \* Due diligence is not a fixed concept. It must vary with the circumstances of each application. In the present case, the application requires the generation of years' worth of data and negotiations with state and federal entities for approval to use the water. The process from siting a ga[u]ging station to finishing construction of a pipeline will run, assuming the best case, over ten years. Given the legal constraints on developing the Tenmile Creek water right, the applicant could not possibly apply water to beneficial use in a five year period. We find that CBNB's August 2000 resolution evinces an intent to develop its permit with due diligence under the circumstances. If CBNB does not proceed to develop its water right with the appropriate diligence under the circumstances, WRD may refuse to grant an extension for the water right."

(Emphasis added.)

■    We understand the gravamen of WaterWatch's first and second assignments of error to be that the commission erred in issuing the permit because CBNB does not intend to apply the water to a beneficial use in the time and manner required by the statutes. WaterWatch argues that it violates the public interest as a matter of law to grant a permit to an applicant that acknowledges at the outset that the construction of diversion works will not be completed, nor even begun, within the statutory five-year time period. It notes that Oregon's water allocation system is based on the doctrine of prior appropriation. *See Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 666, 919 P2d 1172 (1996). Under that doctrine, a person acquires "an appropriative right on a 'first come, first served' basis by diverting water and applying it to a beneficial use." *Id.* at 667. WaterWatch points out that Oregon's water permit system adopted in 1909 continues Oregon's system of prior appropriation with priority dates tied to the date of receipt of the application for a permit. *See* ORS 537.150(2). It also asserts that, under Oregon's permitting system, permits may be granted only to those planning to make beneficial use of the water and that the ability to use the water must be more than speculative. *See* ORS 537.130; ORS 537.160; ORS 537.190.

WaterWatch further explains that the legislature has adopted specific requirements, including time requirements for how and when water must be applied to a beneficial use under the permitting scheme. In particular, WaterWatch relies on the portion of ORS 537.230(1) that provides, "The construction of any proposed irrigation or other work shall be prosecuted with reasonable diligence and be completed within a reasonable time, as fixed in the permit by the Water Resources Department, not to exceed five years from the date of approval." According to WaterWatch, even though the five-year construction completion requirement in ORS 537.230(1) applies to CBNB, all that CBNB intends to do is to collect flow and water quality information to determine how, and *if*, it can use the water. WaterWatch asserts that this activity was designed merely to justify an extension of 50 years. According to WaterWatch, even if CBNB's demand projections come true, it will not use the water from

Tenmile Creek until 2025 or later. Thus, as we understand WaterWatch's position, where CBNB intends to collect flow and water quality data and has no intention to begin or complete the construction of diversion works within the five-year period in ORS 537.230(1), the commission erred in determining that CBNB's data gathering activities constituted "reasonable diligence." For those reasons, WaterWatch contends that it would not be in the public interest under the statutes to issue this permit.

Respondents' general response to WaterWatch's argument is that "[t]he text, context and history of Oregon's water law statutes show that applications for municipal uses of water are afforded special consideration and that municipal water right applications can take into account all reasonable and usual municipal purposes that reasonably may be anticipated for future growth." Respondents argue that WaterWatch's argument is flawed because it fails to take into account the "[s]ignificant and substantial differences" between municipal and other water users. They assert that, because of those differences, "the five-year period initially established for developing and perfecting other water rights does not bar the application of * * * CBNB, even though CBNB will not fully develop its water right within the first five years." According to respondent, in view of the other statutes relating to municipal water users, the five-year timeline is only a guideline with respect to municipal water users.

The question that we must resolve is if, and how, the provisions of ORS 537.230 apply to municipalities. In determining the meaning of a statute, we look first to its text and context to ascertain the legislature's intent. *PGE*, 317 Or at 610-11. The context of a statute includes related statutes and the statutory framework. *Denton and Denton*, 326 Or 236, 241, 951 P2d 693 (1998).

We begin with a brief overview of Oregon's water law pertaining to the appropriation of water for a beneficial use as articulated by the Supreme Court in *Teel Irrigation Dist.*:

"Oregon's current scheme of ground and surface water allocation is rooted in the doctrine of prior appropriation for a beneficial use. Under this doctrine, a person may acquire an appropriative right on a 'first come, first served' basis by

diverting water and applying it to a beneficial use. Generally, any person intending to acquire a right to appropriate surface water first must apply to the department for a permit to make the appropriation. The application for the permit must include the following information: (1) the source of the water supply; (2) the nature and amount of the proposed use; (3) the location and description of the proposed diversion; (4) the time within which the applicant proposes to begin construction; (5) the time required for completion of the construction; and (6) the time required for the complete application of the water to the proposed use. * * *

"Subject to various conditions that are not relevant in this case, the department must approve a proper application that contemplates the beneficial use of water, unless the proposed use conflicts with existing water rights. The permit allows the permittee to begin construction of the diversion project and the appropriation of water. Generally, the permittee must begin construction within one year of the approval of the application and must complete the construction within a reasonable time as determined by the department, not to exceed five years from the approval. For good cause shown, the department may allow extensions beyond the five-year limitation.

"The permit itself does not represent a perfected and vested water right. The water right is perfected when the water actually is put fully to a beneficial use. Perfected water rights are appurtenant to the land, so that they travel with the land, unless the seller specifically withholds those rights on sale. A holder of a perfected water right may apply water to lands other than those to which the water right is appurtenant, by filing an alternate acreage petition with the department and obtaining its approval.

"Once the permittee has completed the construction and has begun applying the water to a beneficial use, a 'final proof survey' is prepared as 'proof' of a perfected water right. Although, historically, such surveys were prepared by the department, the 1987 legislature amended ORS 537.230 to require the permittee to hire a certified water right examiner to survey the appropriation. Once the department finds, based on the final proof survey, that the permittee has appropriated the water for a beneficial use in accordance with the law, the department issues a water right certificate to the user. The certificate shows the user's priority, dated to the time of the original application, the

extent and purpose of the right, and a description of the land to which the water is appurtenant. The certificate represents a vested, perfected water right that continues so long as the water is applied to a beneficial use in accordance with the terms of the certificate, subject to loss by nonuse and other events."

323 Or at 666-68 (footnote and citations omitted). As the Supreme Court recognized in *Teel Irrigation Dist.*, the purpose of Oregon's water law is to ensure that water is actually appropriated for beneficial use in a timely manner. With that in mind, we turn to WaterWatch's arguments concerning the applicability of ORS 537.230 to municipalities.

▪ We first conclude that the text of ORS 537.230(1), *see* 193 Or App at 101, demonstrates that the time requirements established in that statute apply to municipalities. The text of the statute exempts municipalities from the requirement in the statute that construction work *begin* in one year, but the requirements relating to prosecution and completion of the work apply to *any* diversion works and do not exclude municipalities. If the statute does not apply to municipalities, it would not have been necessary to articulate an exception for municipalities from the requirement that construction work begin within one year of the date of the approval of the application. Further, the legislature could easily have exempted municipal applicants from *all* of the time requirements of the statute. It is apparent that the commission believed that CBNB's application was subject to the requirements of ORS 537.230(1) because it included in the permit a condition that "[c]omplete application of the water to the use shall be made on or before October 1, 2005." Thus, we conclude that the five-year construction completion requirement applies to municipalities.

Further, the text of ORS 537.230(1) provides that "[t]he *construction* of any proposed irrigation or other work shall be prosecuted with reasonable diligence and be completed within a reasonable time, as fixed in the permit by the Water Resources Department, not to exceed five years from the date of approval." (Emphasis added.) "Construction" refers to "the act of putting parts together to form a complete integrated object." *Webster's Third New Int'l Dictionary* 489

(unabridged ed 1993). Here, based on the commission's findings, *construction* of diversion works will not be completed as required by the statute nor will any *construction* of those works even begin within the statutory time period or the time period included as a condition of the permit.

Finally, the text of ORS 537.230(1) provides that the applicant shall proceed toward completion of the construction with "reasonable diligence." It also specifically provides that the outside limits for the exercise of reasonable diligence and the completion of construction is five years. The commission determined that CBNB's intent to collect only water quality and flow data during the five-year time period constituted reasonable diligence under the statute. That determination, however, is inconsistent with the terms of the statute that require reasonable diligence in the prosecution and completion of *construction* of diversion works and is error as a matter of law.

Respondents rely on a number of related statutes to support their position that municipal applicants are to be treated differently and that the five-year construction completion requirement of ORS 537.230(1) is only a guideline for municipal water applicants. Respondents first point to ORS 537.230(2), which provides:

"Except as provided in ORS 537.240 or 537.248, the department, for good cause shown, shall order and allow an extension of time, including an extension beyond the five-year limit established in subsection (1) of this section within which irrigation or other works shall be completed or the right perfected. In determining the extension, the department shall give due weight to the considerations described under ORS 539.010(5) and to whether other governmental requirements relating to the project *have significantly delayed completion of construction* or perfection of the right."

(Emphasis added.)

Respondents rely on subsection (2) for the proposition that the five-year construction completion requirement is only a guideline and that the acknowledged inability of a municipal applicant to meet the five-year deadline is irrelevant because it can obtain an extension for "good cause."

However, the text of ORS 537.230(2) indicates that it applies, not at the time of issuance of a permit, but after the permit has been issued and delays occur. It requires the evaluation of whether other governmental requirements *"have significantly delayed completion of construction* or perfection of the right." (Emphasis added.) The legislature's use of the phrase "completion of construction" contemplates that construction has at least begun. Thus, ORS 537.230(2) allows a holder of a water appropriation permit to obtain an extension of the five-year construction completion deadline if construction has begun but circumstances develop after the issuance of the permit to justify the extension. In contrast, that statutory provision may not be used to justify the approval of the permit in circumstances where it is a certainty that construction of the diversion works will not begin before the expiration of the five-year time period imposed by both the statute and the time period imposed as a condition of the permit itself.[13]

Respondents also rely on ORS 537.260 to support their position. They argue that that statute makes clear that the legislature intended municipalities to be able to develop and partially perfect water rights incrementally. ORS 537.260(4) provides:

---

[13] Although not cited by the parties in this case, we note that the department's rules that govern applications for extensions of time for municipal water right permit holders to complete construction pursuant to ORS 537.230 are consistent with our interpretation of the statute. "In order to approve an application for an extension of time for municipal and quasi-municipal water use permits [sic] holders to complete construction and/or apply water to full beneficial use pursuant to ORS 537.230 or 537.630, the Department shall find[,]" among other things, that "[t]he applicant began *actual construction* on the project, as defined in [OAR] 690-315-0020(3)(d), within the time period, if any, required under the applicable statute[.]" OAR 690-315-0080(1)(b) (emphasis added). OAR 690-315-0020(3)(d) provides, in turn:

"Evidence of the actions taken to begin actual construction within the time period in the permit or previous extension:

"(A) 'Actual construction' means physical work performed towards completion of the water system, which demonstrates both the present good faith of the water right permit holder and the water right permit holder's intention to complete the project with reasonable diligence;

"(B) 'Actual construction' does not include planning a diversion system, formulating a business plan, securing financing, letting contracts, purchasing but not installing equipment, or surveying."

Here, as we have explained, the commission's findings indicate that CBNB intends to collect only water quality and flow data during the five-year period provided in ORS 537.230(1).

"A municipality may partially perfect not less than 25 percent of the water authorized by its permit without loss of priority or cancellation of the municipality's permit under this section. If a municipality defers perfection of its water right under this section, the department shall issue a certificate under ORS 537.250 only for the amount perfected. Upon perfection of the deferred amount, the municipality shall request a water right certificate for the remaining portion of the water applied for in the original permit application. As used in this section, 'municipality' includes a city, a port formed under ORS 777.005 to 777.725 and 777.915 to 777.953, a domestic water supply district formed under ORS chapter 264 or a water authority formed under ORS chapter 450."

Respondents are correct that that statute gives special treatment to municipalities and contemplates incremental development and partial perfection by municipal water users. Notably, however, the exception given to municipalities is not unlimited. ORS 537.260(4) provides that a municipality may partially perfect its water right "without loss of priority or cancellation of the municipality's permit." However, the statute also requires that, to obtain that exception, the municipality must perfect "not less than 25 percent of the water authorized by its permit." More importantly, nothing in ORS 537.260(4) supports respondents' position that the text of ORS 537.230(1), imposing a five-year construction completion deadline, should be ignored or read to be only a guideline with respect to municipal applicants.

Respondents also assert that there is no question that the use of water for a municipal purpose is a beneficial use. To support their argument, respondents rely on ORS 536.300(1), which provides:

"The Water Resources Commission shall proceed as rapidly as possible to study: Existing water resources of this state; means and methods of conserving and augmenting such water resources; existing and contemplated needs and uses of water for domestic, municipal, irrigation, power development, industrial, mining, recreation, wildlife, and fish life uses and for pollution abatement, all of which are declared to be beneficial uses, and all other related subjects, including drainage, reclamation, flood plains and reservoir sites."

We understand respondents to argue that, because that statute provides that a beneficial use includes "existing and contemplated needs and uses of water for * * * municipal" purposes, it follows that municipalities should be allowed to obtain all water necessary for future municipal uses, regardless of other statutory requirements regarding water appropriation.

Again, however, respondents read more into the statute than its text provides. The words of the statute simply state that the enumerated uses are declared to be beneficial uses. Even though the statute addresses existing and contemplated needs and uses for municipal purposes, it does not distinguish municipal uses from other beneficial uses, nor does it eliminate other statutory requirements for water appropriation.

Respondents also assert that future needs must be considered when a municipality makes a water right application. They rely on ORS 540.610(4), which provides:

> "The right of all cities and towns in this state to acquire rights to the use of the water of natural streams and lakes, not otherwise appropriated, and subject to existing rights, for all reasonable and usual municipal purposes, and for such future reasonable and usual municipal purposes as may reasonably be anticipated by reason of growth of population, or to secure sufficient water supply in cases of emergency, is expressly confirmed."

That general confirmation that a municipality may acquire rights to the use of water does not override the specific requirements of ORS 537.230(1). ORS 540.610(4) is part of a statute concerning the forfeiture of water rights following a period of five or more successive years of nonuse. ORS 540.610(2) allows an appropriator to rebut the presumption of forfeiture for a variety of reasons, including that a city's water right is "for all reasonable and usual municipal purposes," ORS 540.610(2)(a), or that a forfeiture would impair the rights of cities and towns to use the water, ORS 540.610(2)(b). Those two paragraphs indicate that the legislature does not favor the forfeiture of a water right implicating municipal purposes. The statute appears to contemplate

a broad view of municipal uses.[14] Nonetheless, the provisions concerning forfeiture of a water right do not affect the construction requirements of ORS 537.230(1) that apply to municipalities in *obtaining* a permit.

Finally, respondents argue that "[t]he ultimate determination on a water right application is whether the proposed use will impair or be detrimental to the public inter-est." They assert that, considering all of the above statutes and the legislature's intention that municipal users should be allowed to seek water rights for both present and future uses, it is evident that the legislature intended that the five-year construction completion deadline in ORS 537.230(1) be "a guideline and standard by which to judge due diligence in efforts made toward perfecting a water right," and that that statute should not be construed to preclude CBNB's permit application under the circumstances of this case.

As we have already explained, respondents point to general statutes concerning municipal water users and con-tend that those provisions make it apparent that, under those circumstances, it is in the public interest for CBNB to obtain this water. Respondents reason that, if the commis-sion determines that it is in the public interest for CBNB to obtain this permit, it should be issued regardless of the terms of the specific statutes governing the issuance of water appro-priation permits.

Respondents are correct that municipalities are given favorable treatment in many respects under the water appropriation statutes. Further, respondents offer numerous persuasive practical and policy reasons why it might make sense to allow a municipal user to obtain a water appropria-tion permit under these circumstances. Nonetheless, the text and context of the present statutes do not provide for the

---

[14] OAR 690-300-0010(29) defines "municipal water use" as

"the delivery and use of water through the water service system of a municipal corporation for all water uses usual and ordinary to such systems. Examples of these water uses shall include but are not limited to domestic water use, irri-gation of lawns and gardens, commercial water use, industrial water use, fire protection, irrigation and other water uses in park and recreation facilities, and street washing. Such uses shall not include generation of hydroelectric power."

exception to the five-year construction completion requirement in ORS 537.230(1) that respondents seek. To exempt municipalities from that requirement, we would need to add language or omit language from the statute, which we are not allowed to do. ORS 174.010; *PGE*, 317 Or at 611. If the legislature intends that municipalities be given the special exemption sought by respondents, it may amend the statutes to provide it. There may be persuasive policy arguments that support exempting municipalities from some or all of the requirements for issuance of a water appropriation permit, but that is a decision for the legislature to make.

To summarize, the five-year construction completion requirement in ORS 537.230(1) applies to municipalities. Based on the commission's findings, during the statutory period, CBNB intends to collect only water quality and flow data and *construction* of diversion works will not begin. As a matter of law, those findings do not demonstrate that, on issuance of the permit, CBNB will exercise reasonable diligence in the *construction* of diversion works. Consequently, the commission erred as a matter of law by granting a permit where the requirements of ORS 537.230(1) will not be satisfied. To allow the issuance of a permit in those circumstances is inconsistent with the statutes and rules of the commission governing water appropriation as well as the doctrine of prior appropriation for beneficial use that Oregon water law is designed to further. For those reasons, the commission erred as a matter of law when it determined that the issuance of the permit was in the public interest under ORS 537.153(2).

WaterWatch's remaining assignments of error concern CBNB's estimated need for water and whether the commission's determinations are supported by substantial evidence. In light of our resolution of WaterWatch's first and second assignments of error, there is no need for us to address the remaining assignments.

Reversed and remanded.